Good morning, your honor. I would like to save five minutes of my time for rebuttal. Thank you. May it please the court, I'm Elizabeth Hopkins. I'm here on behalf of the plaintiffs Stephen, Laura Bafford, and Evelyn Wilson. The plaintiffs here are two retirees who worked for decades for Northrop Grumman and a company that became part of Northrop and who carefully planned their retirements based on information that they were given year after year by defendant Hewitt acting on behalf of Northrop. This is information in the form of pension benefit statements that ERISA requires fiduciaries provide to plan participants so that they can know where they stand with respect to their retirement. But the information that defendants provided was not uncovered until Hewitt handed off its responsibility to another company that did that immediately did the audit that Hewitt should have done itself and that Northrop should have required. But this was too late for the plaintiffs for Mr. Bafford and Ms. Wilson who had already retired thinking they knew what their pension benefits were. In fact, the mistake when it was finally uncovered, it led to their pensions being cut in more than in at least half. Ms. Wilson's work was cut by about 50 percent and Mr. Bafford's by about 60 percent. Counsel, I have great empathy for your clients. I really do. But we're trying to construe the law here and according to what we've got. Let me ask you this. The First Circuit case of Livick versus the Gillette Company is almost on all fours. Why should we not follow the reasoning of Livick in this case? Well, your honor, Livick involved actually involved somebody who worked for a company called Parker Pen that merged with Gillette. When that merger happened, that participant was given detailed and correct information about his benefits and some letters. Later on, he received some incorrect information from a human resources person at Gillette and the court relied on an interpretive bulletin from the Department of Labor to conclude that that person was not a fiduciary because that was just a mere calculation of benefits and that wasn't a fiduciary act. But there's no discussion of whether that person had discretionary authority and in fact, the discussion makes it sound like that person did not. And the First Circuit also, and I think this is important, distinguished some cases from other circuits, from the Fifth Circuit in a case called Bowerman and from the Seventh Circuit in a case called Schmidt, which have said that hired or appointed other people who gave inaccurate information can have fiduciary responsibility. And the court said that those cases were distinguishable because in this case, in that case, in Livick, the participant had been given clear and accurate information at the outset. So, you know, I would say there are sort of two bases for distinguishing Livick, you know, that clear and correct information that Livick had, number one, and number two, the fact that, you know, there's no discussion, no discussion of an allegation that the human resources person was exercising discretion. Here, to the contrary, what we have alleged is that Hewitt was given an exercising discretionary authority in preparing and statements because it was doing so according to requirements documents that it prepared itself. And these documents essentially interpreted plan provisions and let, you know, let Hewitt have part launch in preparing these benefits statements. Let me follow up on that question. How did Hewitt exercise discretion if the calculations it performed were according to the plan's formula? Well, it requires, there's a formula for sure, but this wasn't a mere clerical or mathematical error. Why not? Well, it didn't involve, you know, adding a zero, you know, not carrying a number. With respect, counsel, and perhaps I misunderstand the fact, but what I understood was that your clients had certain information that was given to Hewitt. They applied a formula, in this case, like they did in all others, and came up with a solution, as they thought. Turned out it was wrong, but they followed a formula. If that's correct, why is that a fiduciary exercise rather than a essentially ministerial responsibility? Let me try to untangle that. They applied a formula for sure, and there were inputs from the participants, basically when they wanted to retire and when they wanted their pension benefits to begin. Those were sort of the X factors that were inputted by the participants, but what Hewitt needed to do, and what it did do, was look at multiple plan documents and decide how to credit what the employment history was, but especially here, how to credit the final average earnings of the two participants. But that was in accordance with the formula, was it not? I'm not sure formula is the right way to look at it. It was. Perhaps formula is not the right word, but they had a matrix, if you will, that they had to fill in the blanks, and part of that was the average salary, years worked, etc., etc., etc., and they put it all in and came up with an answer. Now, it turned out it was wrong, but the question is, is it a fiduciary responsibility if you have a matrix or a formula, and they faithfully applied that, and it turned out to be wrong? Well, they made up the matrix that they used. I mean, that's what Hewitt did. They made up the formula? They did. They made up the matrix, I would say. I'm not sure. Again, I'm not sure I'd call it a formula, but what you see... Counsel, if I could break in, wasn't the error here whether they were actually employed by Northrop in the second go-round, as opposed to still being on the earlier company that was doing it? That is, when they pushed the button, your people had told them, I'm working for Northrop, and they believed it, and it turned out under the plan, as the plan states, they really didn't count the second go-round as being at Northrop. I mean, is that fair as to what really happened? It's not quite, Your Honor. They were employed at Northrop during the second period, and in fact, that period of employment was counted as far as years of credit service. What it wasn't counted for was the final average earnings, and that was... Their earnings in what I call the second go-round didn't count under the plan, and the error that Hewitt made was counting the level of those higher earnings, correct? That is correct, and that was based on... They pushed the button, but they pushed the wrong button. No, I don't think that's correct, Your Honor. I think that's because Hewitt, in coming up with the matrix that it used, not the employees. The employees, like I said, only entered very said, in this situation, he used... They looked at plan documents, and somebody interpreted them wrong and said, you look at the final average earnings from the second period, not from the first period. That's what we believed happened. That's what, essentially, the denial or the recalculation letters say happened, that we, Hewitt, or it's on Northrop Grumman letterhead, incidentally, but that we made a mistake in using your final average earnings from the second period and not from the first. This was a fault of Hewitt. It had nothing to do with what... I, again, would have to get back to the issue of the fiduciary thing. They have named fiduciaries and acting fiduciaries. I wrote a case about two years ago called ACOSTA that referred to two hats, basically, like the Supreme Court did, and what I'm struggling with here is, what hat do these people have on? It seems to me, based upon our conversation thus far, that Hewitt didn't exercise fiduciary discretion in calculating these things. It took a matrix, it got input, and I think you've got lots of other people involved in this as well, who are affected by the very same thing. How many people would theoretically be involved in this class? Your Honor, we don't know exactly how many, but we think there are probably hundreds of people, just based on how many people worked at TRW. Okay, so this... We don't know exactly. Okay, let's say there are thousands, whatever it is. The reality is, a lot of people, and I have great personal empathy for them, the reality is that there was a matrix that was followed. Turned out it was a mistake. The question under ERISA law is, what role did Hewitt play? Was it effectively carrying out a ministerial responsibility, where it applied all the same incorrect information to everybody, or did it actually have discretion, where it could have varied from person to person? From what I'm reading, I don't see the latter. I see the former. Why is that wrong? Because the matrix wasn't handed down by Northrop. It wasn't just some pre-existing matrix. It was a matrix that was built by Hewitt and incorrectly based on Hewitt's looking at plan documents and deciding how it applied in this situation. That is the discretion that we're arguing existed, and that is sufficient discretion to make Hewitt into a fiduciary. It's a third-party administrator. This is plan administration, and it's interpretive. Ms. Hopkins, wasn't it just an error in the high threes? They were supposed to determine the high threes for these employees, and because there were changes in the company that they were working for, there was an error in calculating their high threes. Isn't that right? Their highest salaries for three years. I thought that's how it was done. So, why I'm trying to figure out, and I think this is along the same lines Judge Smith is asking, why is that a fiduciary function and not a ministerial function? It seems like the first intense circuits were very persuaded by the Department of Labor guidance of stating that a formula is not a fiduciary function. So, I just wanted to ask you, Department of Labor, is that appropriate to give them that kind of significance? Well, I mean, the interpretive bulletin actually says if a formula is applied or procedures that are made by another fiduciary, that are done by another fiduciary, then the entity that's just plugging in the numbers, for instance, is acting in a ministerial capacity. But as I've said, the matrix, the plan interpretation that led Hewitt to only count the years, the final three years at Northrop and not to have cut off as the final average earnings, to have cut it off during the first period of employment with Northrop, that came from Hewitt, not from Northrop. And that's what we allege the fiduciary activity is. That's entirely consistent with the interpretive bulletin from the Department of Labor. And it's really what distinguishes it from the cases where somebody, you know, where an entity was simply taking, using either information or a formula given to it by another fiduciary and not exercising any discretion itself. The point is, there always has to be a fiduciary involved in doing this. And here, the argument being made by the defendants is that no one, not the plan sponsor, not the plan administrator, and not the entity that they hired to give this critical information. This pension benefit statements and disclosures in general to participants are at the heart of the statute. They're set forth in the first provision of the statute about statutory purposes, in the first section of the statute about disclosures and reporting. And they're, frankly, one of the animating purposes behind the enactment of ERISA in 1974, particularly information about defined benefit plans. Another question, just before your time is up here. With respect to the section 105 claim, just trying to figure out what exactly the plaintiffs here are alleging. Is it that they made a written request for a statement that the statement or that the first statement and the every three years? Was it clear to me from the complaint? The 105 claim is based on the inaccuracies in the statements that were provided. And we believe there were written requests, but whether or not there were written requests under section 105 in a defined benefit plan, the plan administrator has to provide a statement every three years. But they can, there's an alternative way to do that, which is to tell participants how you can get these statements. Where did the plaintiffs plead that they made a written request? Because I was looking for that, and I couldn't find it. Maybe when you come back, you can tell us where that is. Thank you, Your Honor. I'll present the rest of my time, and I'll address it. You don't have any more time, but we're going to give you some more. Now, we've got two counsel representing Northrop and affiliates. So, Ms. Ross, you're going to have eight minutes, and Ms. Ridley have seven. So, let's start with Ms. Ross, who has eight minutes, and then we'll go to Ms. Ridley. So, Ms. Ross, please. May I please support, Your Honors? Judge Boggs, Judge Smith, Judge Murguia, good morning. Your Honors, as you know, I am representing the Northrop dependents in this case. The Northrop dependents liability is derivative on top of derivative. And essentially, it depends upon a finding that Hewitt here, or also known as Halite, breached its fiduciary duties in responding on a computerized benefit calculator by giving the plaintiffs the wrong information. I think that Judge Murguia, as you noted, the law, the Department of Labor has very expressly said that providing benefit calculations is not a fiduciary act. And this court... So, let me ask you the same question. How relevant is the Department of Labor guidance here? I know the First and the Tenth Circuit gave it some significance, but are we bound to follow that guidance? Your Honor, the DOL interpretive bulletin is not binding, but it is persuasive. It is an interpretive bulletin. And in fact, this court acknowledged that exact same regulation, or I'm sorry, interpretive bulletin in the King versus Blue Cross Blue Shield case. So, it has been acknowledged by this court. But Your Honors, let me go on because there's an additional consideration where my clients are concerned. So, my clients are the plan sponsor, Northrop Grumman Corporation, that appoints the fiduciary committee, the administrative committee of the Northrop Grumman pension plan. Those are the other two named defendants. But the law holds expressly, and this court recognized it in the Arizona State case, that once a fiduciary appoints a fiduciary under 29 U.S.C. 1105C2, the fiduciary cannot be liable for the conduct of the delegate. Okay? The issue is, was the appointment prudent? Here, plaintiffs say nothing about Northrop Grumman or the committee having made an imprudent appointment of Hewitt. And it would, frankly, be very difficult for them to argue that, given that Hewitt is one of the most well-respected entities that performs this service to benefit plans. It cannot be. So, counsel, does that mean that you agree that Hewitt is a fiduciary in this situation? Your Honor, that is not my position at all. I think that under the Department of Labor guidance, Hewitt was not performing an act. But my point is, Your Honor, and thank you for raising that. Between being generally a fiduciary and performing a fiduciary act, are you saying they're not a fiduciary at all, or simply they weren't performing a fiduciary act at this point? With respect to the facts here, Your Honor, they were not performing a fiduciary act, pursuant to the Department of Labor explanation that ministerial acts, such as calculating benefits, is not a fiduciary act. But, Your Honor, more importantly, from my standpoint, is the question of the derivative liability of my clients. And the law is very clear, as I've just said at 29 U.S.C. 1105 C.2, that when a fiduciary appoints another to carry out its duties, its liability is a limited one. If that's true with respect to delegating fiduciary duties, then it is even a more diluted liability with respect to delegating the ministerial functions that were at issue here. Ms. Ross, why is it the Second Circuit decision in Sullivan-Mastecchi on point here? Well, Your Honor, I'm glad you asked that, because in some respects, I did want to segue into the lack of an available remedy. So, I do not stand before this court and say that there could never be extraordinary circumstances where a plan participant would have had a misrepresentation and could collect. I think the court has clearly recognized it. This court recognized it in the Gabriel case, where it very methodically went through the various remedies that are available in this type of situation, or I should say not available. But in Sullivan, Your Honor, it presented those extraordinary circumstances. That was just a terrible situation where the plaintiff's mother was dying of lung cancer, and based upon the plaintiff's representations as to what her mother's life insurance would be, the plaintiff quit her job and moved in with her mother to take care of her mother through her final days of living. And then it turned out that, in fact, the amount of the life insurance was wrong. In King, Your Honor, this court found the type of extraordinary circumstances. But in King, the plaintiff's mother was asked to get pre-approval for emergency surgery, was given the pre-approval, and then only after she had the surgery was she told that she had not met her lifetime maximum. There clearly are extraordinary circumstances, but as the Seventh Circuit said a number of years ago in Fromm v. AXA equitable, negligence in corporate America is inevitable, but it is not actionable. What this case presents, Your Honors, is the unusual circumstance of a mistake made with respect to two participants out of 110 participants in the plan. Plaintiffs used the word systemic throughout their complaint, throughout their briefing, but they allege no evidence of any systemic error here. We have only two participants. Nor, Your Honors, going back to the... So there's no... your calling on the other side suggested there were a hundred or so people. You're saying there are only two and that the mistake only applied to the two that are listed as plaintiffs. Is that right? That is the allegations. That is the evidence in the record, Your Honor. Plaintiffs had the right to leave to amend their complaint by the district court. They chose not to amend their complaint and rather they asked the district court for a final judgment to bring this appeal. Plaintiffs had the opportunity to show that this was a much more pervasive error and they chose not to do so. So as we come before this court, that is what the allegations show. That there were two people who unfortunately were told the wrong amount of their benefit. That is not the type of case. You agree that over time there were lots of other people involved. Let me ask you this. Does the record reflect that either of the plaintiffs, or if there are more, that any of them expressly asked for a benefits calculation? Your Honor, the way the system works, and this is related to Judge Murkia's question about 105, the way the system works is under the law a plan administrator is required to give a pension statement telling you what your benefit is at the time, either once every three years or upon written request. Plaintiffs here are trying to latch on to that section 105 of ERISA and say that this constituted a written request for a benefit statement. Your Honor, that is not the case. This is a calculation which you go in, you plug in your various assumptions, whatever you choose, and you get an estimate. It says all over it, this is only an estimate. It is not a statement of your current pension benefit. It is, in fact, an estimate of if you retire under the particular assumptions you've plugged into this calculator, here's what your benefit would be in the future. So the plaintiffs themselves are the ones who went to the matrix, entered the data, and got the response. Is that your position? That's correct, Your Honor, as many, many, many participants can do. 24-7. So to hold that the plan administrator has a responsibility to treat that as a written request for a benefit statement, as ERISA requires under section 105, would absolutely tie up the hands of plan administrators. They could never operate because they'd be responding to these, you know, hundreds of thousands of people who go in all day long and look for their benefits assumptions. Your Honor, if I could just ask a question regarding the written request. There's not a lot of law on ERISA section 105, but can an online request be a written request, or is there authority that says that it cannot be a written request? There is indeed authority, Your Honor, that says that an electronic request is not a written request, and we've stated that in our briefs. You know, I will say, Your Honors, the law will probably change eventually. ERISA is changing little by little. This is a little off point, but Congress is, you know, being asked to consider the electronic disclosures of the mandatory disclosures that ERISA requires, but we haven't gotten to that point. And, you know, I don't have to tell this court. If I could ask a question here, just do I understand it correctly that when you say they put in various input data, is it correct that they received nothing back from Hewitt other than the whatever was on the screen? I guess I had the feeling that they had input some data, and then Hewitt said, you know, here are your benefits. Am I wrong about that? No, I think you're actually right, Your Honor, with a little bit of a twist. What would happen is they would put in, in the case of Mr. Baffert, he started in 2010. He retired in 2016, and he started playing around to see what his benefit would be when he retires in 2016. What I understand happens, Your Honor, perhaps my colleague, Ms. Ripley, can talk to this more specifically, is that the participant plugs in the assumptions online, and the participant is then mailed an estimate. Okay, so there was an estimate mailed as of some particular time based on some particular data. Yes, and every time that there was a request based on future assumptions. But again, Your Honors, it can't be that going on to a benefits calculator, which you have access to 24-7 for 110 participants. And so if he put in a different assumption, he would have gotten a different statement. If he said, I'm going to retire in 2015 or 2017, or if he said, I'm making $100,000, or I'm making $120,000, that was just an assumption. Is that the way you put it? That's exactly right, Your Honors. I think you also said that the matrix, if you will, warned that these were just estimates. Would that have been on the written statement that was mailed after the participant provided the input? Absolutely, Your Honor. Every single statement that the participants got say that they are estimates, including when they go to trigger their benefits, and they get the information as to what their benefit will be. And I don't have to tell this Court, having sat for as long as you have, that ERISA is a very detailed, reticulated statute. Congress provided for certain remedies and didn't provide for other remedies. And this Congress's intentions and not expand the remedies that are available. And this is, as I say to the Court, this is an unfortunate situation involving two people. We know of no more than two people here. And plaintiffs, in order to hold my client responsible under the law, would have to show that my client failed to meet with the appointed record keeper at reasonable intervals in order to assure that Hewitt was performing according to the plan and ERISA. There is nothing in this complaint, Your Honors, with respect to that. There is no allegation that the appointment was imprudent. There is no allocation that my client didn't meet with Hewitt on reasonable interviews. And again, Your Honors, I point to the fact that this involved two people. So it is not the systemic type of situation that my clients are referring to. Your Honor, if I may, and I'm not sure. Actually, way, way, way over time. It's our fault. But let me just ask my colleague whether either has additional questions for Ms. Ross. No, thank you. We could probably go on for a long time, but we're now going to have the opportunity to hear from Ms. Ridley, who will further elucidate. Thank you, Your Honors. Good morning, Your Honors. May it please the Hewitt. I want to address some of the things that were said. I should note that Hewitt is not an affiliate of Northrop. It's a separate entity. I just wanted to note that. Having said that, the court is correct in understanding that the tasks that were being done here were, in fact, ministerial. There was not an interpretation of a plan. There was not discretionary activities that were going on. It was literally, you know, a ministerial calculation based upon assumptions that were put in by the participants themselves. Let me ask you this. As you heard, Ms. Ross indicated that when the data were input into what I'll call the matrix by the plaintiffs in this case, they were mailed a written response. She understands, and I'd like your understanding of whether that response highlighted that this was merely an estimate. Thank you, Your Honor. Yes, it did. It not only highlighted that it was an estimate, but it noted that there could be changes specifically from Northrop. In fact, there were acknowledgments that these were estimates, at least with regard to Baffert. That was true for every time that there were inputs put in and production of a report coming back out. Thank you. Having done the ministerial acts, Hewitt was not, in fact, a fiduciary. As a consequence, the claims against Hewitt were appropriately dismissed by the district court. As this court has noted, it based that not only on Livick, but also on Le Bon, recognizing that simply calculating benefits and providing estimates of benefits are just not fiduciary functions. As a consequence, the claims being presented as against Hewitt fail as a matter of law. Let me ask you, Ms. Ridley, if I can, about the preemption and state law claims and whether or not they're preempted by ERISA. It seems to me that the Paulson case has already maybe addressed this case. It's Paulson versus CNF. That state law professional negligence claims whether or not they're preempted by ERISA and concluded that they're not. I'm trying to figure out how this case is different from Paulson. I appreciate that, Your Honor. I think really, Paulson acknowledges that for preemption, it's not just a global professional claims are not preempted. There has to be an analysis whether or not those state law claims are based upon necessarily issues vis-a-vis the plan. If so, and you'll look at the case called Wise, and if so, then there is in fact preemption. That is the case here. There's no recovery except for the plan. Ultimately, what the plaintiffs or appellants here are seeking is the benefits from a plan. As you cannot extract the state law claims from that to apply to ERISA claims, it subsumes those state court claims. When you said they're only seeking recovery from the plan, it seems to me that at least in one set of the claims, they are seeking recovery from you. Otherwise, you wouldn't be here, would you? Yes. I'm sorry if I was inartful. When I say the plan, based on the plan terms, they're seeking benefits from a plan, meaning a description of the benefits as opposed to an entity, the plan. I just want to be clear I'm making that distinction. Because they are basing it on the terms of a plan, you cannot extricate the plan from the state claims. As a consequence, they are preempted. That means that a person in your position can never be subject to state law when dealing with an ERISA plan. Is that the position, no matter what kind of mistakes you make? I don't know that I would say that broadly. If the claims have the terms of the plan as a necessary factor in determining whether or not there's liability in the state claims, they would be preempted. At this point, as I understand it, they're not claiming that the correct plans of the term, the correct terms of the plan were not applied. They're saying that the plan is just fine. It's you folks gave us bad information which caused us harm. If they were saying, and we should have gotten something else from the plan, on that arm, you'd be right. But they're also, as I understood it, their claims against you would accept that they got treated fairly by the plan itself. Am I wrong about that? I don't think they allege it that way, quite frankly, your honor. I think ultimately what they are arguing is essentially an idea that to be made whole, that they should be provided with what they determined to be the amounts they think are due based on the plan terms. And they wouldn't get paid those amounts to be made whole without the plan. And therefore, they cannot extricate themselves from the overlay of a recipient. Is that a pleading problem that their lawyer is not as good as I am in saying that at least in the alternative, our gripe is not that we didn't get what we were entitled to under the plan. We didn't get what Hewitt told us we would get. And that has caused us harm. They have to prove all of that in state court, of course. But assuming that that's a correct reading or an adequate reading of what they pled, what's wrong with that? It's not just a pleading problem. It's an essence problem, because to determine whether or not their claims would be successful or not would necessarily be based upon the terms of the plan itself and what benefits they could, in fact, anticipate receiving based on their retirement and their pensions. Let's say we take your point. Isn't their state law claim in essence just saying this is professional negligence, putting the plan to the side here? They just didn't do what they were supposed to do. No reference to the plan. They just set up this matrix wrong. Now, I'm not saying would win, but in terms of surviving on the pleading, why would that be preempted by ERISA? I think in order to argue a sort of professional negligence, they would still have to go back to the plan, and they'd have to go back to the application of the terms of the plan. And so, like it or not, the way Congress created ERISA, it has an extraordinarily broad preemption provision. And so, there's no way to extricate those claims from, at least as alleged in this action, from the application of the terms of the plan. And I see I'm over time. Let me ask my colleague whether either has additional questions in this scintillating ERISA discussion. Thank you. Okay. Thank you very much, Ms. Ridley. So, Ms. Hopkins, we didn't have much time left. We're lots of things, and we're anxious to hear what you have to say. Thank you, Your Honor. And I personally find the discussion very scintillating. I think I'll start first, actually, with the preemption issue that you were just touching on. I think it's quite clear that Paulson does control here and not the Weiss or Wise decision. And the reason is obvious from Paulson itself, which talks about a relationship test when you're looking at ERISA preemption. The reason the claims in Weiss were preempted is because they involved misrepresentations by the employer to the employee, whereas in Paulson, it was a third party. So, a third party service provider that was determined not to be a fiduciary. So, likewise, in this case, if it turns out that Hewitt did not exercise sufficient authority to be a fiduciary under ERISA, and, you know, I want to be clear, we're asserting that they did exercise that authority, but if they did not, then they are subject under Paulson to state law claims, as it should be. There's no regulatory vacuum here that Hewitt can escape. Let me ask you this, counsel. As you've heard, and I'm sure you knew, your opponents both say that your clients are the only ones involved and that they personally entered data into what you and I have called the matrix. And in response, your clients got a written report, but all over it, it said, this is only an estimate. Things might change. Let's assume that's true for a minute. Wouldn't that undercut any professional negligence claim you might get or might be able to succeed in electing? Your Honor, that would be a factual issue there, but we don't believe that these disclaimers were sufficient. What else should they have said? If the position of Hewitt is that they could be wrong by as much as 50 or 60 percent, they should have said, you know, this statement should not be relied on for retirement. Don't rely on it to retire. Check with your own, you know, actuary before retiring. So basically what you're saying is they shouldn't have even provided this matrix because there's no for them to cover all the potential things that could go wrong. No, they were required, in fact, to provide written pension benefit statements, and that's what this online portal is. You're saying that the matrix fulfilled the every three-year statement requirement? Yes, because the statute says that in order to fulfill the every three-year requirement, you can provide participants with benefits. The participants were given notice that they could go to this online portal and request benefits, and that's what they did. The written benefit request is actually a red herring because it doesn't matter for the three-year requirement whether you make a written request. That's how the plan administrator is meeting its statutory. It's a very serious statutory requirement to let statements, frankly, just didn't do that. They just didn't measure up under section 105 or under ERISA. Let me ask my two colleagues, either of you have any additional questions for Ms. Hopkins? No, thank you. Okay, we thank all counsel. You're all very learned people. You're very specialized in this area. It's very helpful to us. This is a very knotty area, but I assure you that each of us, every night before we go to bed, think about ERISA. How can you sleep otherwise? In any event, we thank you. The case just argued of Vafford versus Northrop Grumman Corporation et al is submitted, and the court stands adjourned for the day. Thank you very much, your honors. Thank you, your honors. Ms. Clark, for this session, stands adjourned.
judges: Boggs, M. Smith, Murguia